UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
                                :
LORETTA McHENRY,                :
                                :
                    Plaintiff,  :
        - against -             :    MEMORANDUM AND ORDER
                                :
ONE BEACON INSURANCE CO., CGU   :    Civil Action No.
INSURANCE CO., and BRUCE A.     :    03-CV-4916
LAWRENCE,                       :
                                :
                    Defendants. :
                                :
-------------------------------X

TRAGER, District Judge:

    Plaintiff Loretta McHenry ("plaintiff"), acting pro se,

brings this action against her former employer, One Beacon

Insurance Co. ("OBI") and her former supervisor Bruce A. Lawrence

("Lawrence")(collectively, "defendants"), pursuant to Title VII

of the Civil Rights Act of 1964 ("Title VII").  Plaintiff alleges

that she suffered discrimination based on her gender, a hostile

work environment and retaliation for engaging in protected

activity.  In addition, plaintiff has also brought claims against

defendants for violation of the Equal Pay Act ("EPA") and a state

law claim of breach of implied contract.

    Defendants move for summary judgment pursuant to Fed. R.

Civ. P. 56(c) on all claims.  For the following reasons,

defendants' motion for summary judgment is granted.

**Background**

Plaintiff is a female attorney who graduated from law school in 1990. Affidavit of Loretta McHenry ("Plaintiff Aff.") ¶ 5. After admission to the bar in 1991, plaintiff worked for the New York City Corporation Counsel from approximately September 1990 to November 1993, defending personal injury suits against New York City. Id. At the time she resigned from her position with the Corporation Counsel, her salary was approximately $43,000 per year. Id. Subsequently, plaintiff worked for an insurance company law office, but left after five or six weeks to take a position as a Trial Attorney with what is now One Beacon Insurance ("OBI"), effective January 10, 1994, at a starting salary of $62,000. Id. Plaintiff was subsequently promoted to Senior Trial Attorney by Bruce A. Lawrence, Managing Attorney of the Brooklyn Legal Office,[1] at a salary of $72,000, less than eighteen months after she was hired. Affidavit of Bruce A. Lawrence ("Lawrence Aff.") ¶ 16; Ex. 14 to Defendants One Beacon Insurance Company's and Bruce Lawrence's Statement of Uncontested Facts Pursuant to Rule 56.1 in Support of their Motion for

---

[1] The Managing Attorney had overall managerial responsibility for the Brooklyn Legal Office, including, but not limited to, personnel, budget, case assignment and management. Accordingly, Lawrence served as plaintiff's supervisor during the time she was employed at OBI. Lawrence Aff. ¶ 10.

Summary Judgment[2] (Salary Change Recommendation form, effective
April 17, 1995).  Thereafter, plaintiff remained in the position
of Senior Trial Attorney until her termination, receiving yearly
salary increases through 2001.[3]  <u>Id.</u> ¶ 19; Def.'s Ex. 15
(Associate Salary History).

OBI claims it terminated plaintiff's employment in February
2003 based on her erratic pattern of behavior over the course of
her employment.  <u>Id.</u> ¶ 30.  Specifically, OBI cited numerous
documented and verbal complaints registered against plaintiff by
her co-workers, an outside vendor and a client.  Defendant's
Memorandum of Law in Support of Motion for Summary Judgment
("Defendant's Memo") at 11.  Plaintiff's conduct had been the
subject of prior written warnings, including a Final Warning, and
was allegedly increasingly disruptive to the office environment.
<u>Id.</u>  Plaintiff disputes these reasons arguing that throughout her
employment she conducted herself professionally and that the
complaints against her were false and made up to cover her co-
workers' and others' unprofessional behavior.  Memorandum of Law

---

     [2]  All exhibits attached to Defendants One Beacon Insurance
Company's and Bruce Lawrence's Statement of Uncontested Facts
Pursuant to Rule 56.1 in Support of their Motion for Summary
Judgment will be referred to as Def.'s Ex.___.

     [3]  Plaintiff's salary increased on her anniversaries as
follows: April 15, 1996- $74,900, April 14, 1997- $77,900, April
13, 1998- $81,000, April 12, 1999- $84,000, April 10, 2000-
$87,300, April 9, 2001- $90,350.  Lawrence Aff. ¶ 19; Def.'s Ex.
15.

in Opposition to Defendant's Motion for Summary Judgment
("Plaintiff's Memo") at 1.

**(1)**

**Incidents Prior to 2000**

In 1995, during the months following plaintiff's promotion
to Senior Trial Attorney, Bruce Lawrence, plaintiff's supervisor,
received two written complaints about plaintiff's workplace
behavior.  Lawrence Aff. ¶¶ 31-33.[4]  Although both these reports
were forwarded to Human Resources, neither was discussed with
plaintiff nor were they the subject of any further action.  <u>Id.</u> ¶
34.  Although there were no other documented complaints regarding
plaintiff prior to late 2000, Lawrence, along with multiple other
employees, observed various behaviors by plaintiff which
concerned them, including spending excessive time in her office
with the door closed, working in her office with the shades down
and the lights off and carrying her pocketbook whenever she
walked around the office.  <u>Id.</u> ¶¶ 36-37; Affidavit of Ann Lecky

---

[4]  In the first documented incident, in May of 1995, Gail
Mizell (female), the then-Office Supervisor, reported to Lawrence
that while plaintiff was complaining about a misplaced expense
reimbursement, plaintiff accused Mizell of "having someone lose
[plaintiff's] money intentionally."  Lawrence Aff. ¶ 32; Def.'s
Ex. 16 (Interoffice Memo, dated May 12, 1995).  In the next
documented incident, four months later, Sandra Peterson (female)
reported that plaintiff "whispered to [Peterson] in a 'very
frightening and threatening manner.'"  <u>Id.</u> ¶ 33; Def.'s Ex. 17
(Interoffice Memo, dated September 9, 1995).

("Lecky Aff.") ¶ 6. Lawrence verbally brought these observations
to the attention of the Human Resources representatives but,
again, no action was taken and these observations were not
discussed with plaintiff. At her deposition, plaintiff
acknowledged these behaviors but offered explanations: she kept
the door closed to keep out noise and concentrate on work, she
worked at times with the lights off and shades down because of
ample natural light and occasional headaches and she carried her
pocketbook around the office by force of habit. Deposition of
Loretta McHenry, conducted July 29, 2004 ("Plaintiff Dep.") at
216-219.

(2)

**Incidents Between October 2000 and July 2001**

Over the course of nine months, from October 2000 to July
2001, plaintiff was involved in over fifteen separate incidents
with numerous employees at OBI, as well as an outside vendor.
Lawrence Aff. ¶¶ 39-171. Plaintiff complained on a number of
occasions that her supervisor and co-workers made inappropriate
and offensive facial expressions at her, and, specifically, that
they stuck their tongues out at her. Plaintiff Dep. at 144-45.
She also generally complained that many OBI employees were
unprofessional. Id. at 157, 244-45; Lawrence Aff. ¶¶ 53, 57;
Def.'s Ex. 31 (email from Lawrence to Human Resources, dated
January 5, 2001), Def.'s Ex. 35 (email from Lynette Michael,

5

Office Supervisor, to Lawrence, dated February 16, 2001).

During this same period, her co-workers complained that plaintiff, without provocation and on multiple occasions, would make objectionable comments to them pertaining to their smell, attire, conduct and hygiene. Lawrence Aff. ¶¶ 52, 56, 61, 62; Def.'s Exs. 29, 34, 38, 39 (various email correspondence between Lawrence and co-workers). They also reported that plaintiff at times would attempt to intimidate them by yelling at them, that she banged on her desk and that she publicly questioned and criticized the promotions of a certain co-worker. Id. ¶¶ 39-40, 45, 65; Def.'s Exs. 20, 24, 40 (various interoffice correspondence between Lawrence and co-workers). When Lawrence brought plaintiff's co-worker's claims to her attention, plaintiff denied them but declined to file a complaint herself, although she did ask Lawrence to instruct people on appropriate workplace behavior. Id. ¶¶ 52, 54; Ex. 32 (Memo from plaintiff to Lawrence, dated January 5, 2001).

The last incident in this string of reported episodes took place in July 2001, and involved an outside vendor, William Seifert.[5] While Seifert was speaking to plaintiff in her office, plaintiff abruptly began to "pace," asked Seifert to leave and when he asked if his questions were bothering her, she responded by saying that it was his "conduct" that bothered her. Id. ¶ 66.

---

[5] In their papers, defendants spell the name Seefeldt.

In her deposition, plaintiff claims that she asked him to leave her office because his conduct was offensive and that Seifert made "inappropriate facial gestures," and that "he was sticking out his tongue." Plaintiff Dep. at 262.

As a result of this complaint as well as the other complaints registered both by and against plaintiff, Lawrence asked Human Resources to meet with plaintiff. Id. ¶ 58. During the meeting plaintiff was vague about the incidents she complained of and reluctant to discuss the issues. Def.'s Ex. 36 (Memo filed by Chavers, dated March 20, 2001). In addition, plaintiff denied having committed any of the acts alleged by her co-workers. For these reasons, the Human Resources representative reported that the meeting was unproductive. Id.

### (3)

### March 2002 Warning

No further incidents were documented for approximately eight months until March 18, 2002, when plaintiff became involved in a dispute with Leonard Lewis, the mailroom clerk. Lewis reported to Lawrence that plaintiff immediately started "screaming" at him and kicked him out of her office after Lewis physically pointed to a file on her chair that she had previously requested. Another attorney, Robert Higgens, heard plaintiff "screaming" and observed Lewis leaving plaintiff's office, looking "shaken". Lawrence Aff. ¶ 70; Def.'s Ex. 45 (email from Higgens to

Lawrence, dated March 18, 2002).

Lawrence discussed the incident with plaintiff and Lewis, separately. Lewis stated to Lawrence that he had done nothing to provoke plaintiff, Id. ¶ 72, but plaintiff claimed just the opposite, alleging to Lawrence that Lewis was looking to provoke a reaction from her with a disgusting, demeaning, and insulting facial expression. Plaintiff Aff. ¶ 43. Plaintiff further stated that at one point Lewis had stuck out his tongue and that she found his facial gestures disgusting and vulgar. Id. ¶ 44. Lawrence advised her that it was inappropriate to raise her voice to a co-worker and that, in the future, if she had complaints regarding Lewis or anyone else in the office, she should bring those complaints to Lawrence's attention. Lawrence Aff. ¶ 73; Def.'s Ex. 46 (email from Lawrence to Lecky, dated March 18, 2002). The next day, on March 19, 2002, Lawrence issued plaintiff a warning letter regarding the manner in which she interacted with Lewis the day before. Id. ¶ 74; Def.'s Ex. 47 (memo from Lawrence to plaintiff, dated March 19, 2002).

After receiving the letter from Lawrence and meeting with Lawrence about the seriousness of her conduct, plaintiff (for the first time) described her co-workers' behavior towards her as "sexual harassment." Lawrence Aff. ¶ 77. Lawrence immediately reported this claim to Human Resources. Id. Plaintiff claims that she complained to Lawrence that Lewis sexually harassed her

the same day Lawrence issued the warning but before she received the letter.  Plaintiff Aff. ¶ 44.

    The following day, March 20, 2002, Human Resources Specialist Ann Lecky ("Lecky") called plaintiff and stated her intention to investigate plaintiff's allegations of sexual harassment and followed up that phone call five days later. At this point plaintiff stated that she did not wish to discuss any of this further with Lecky.  Lecky Aff. ¶ 9; Def.'s Ex. 81 (undated email from Lecky to Lawrence). In her deposition, plaintiff acknowledged getting the first call from Lecky (disputing the date and stating it was the same day as when Lawrence gave her the warning), but denied that Lecky followed up or that she ever said that there was nothing further to discuss with regard to her sexual harassment allegation. Plaintiff Dep. at 275.

### (4)

### November 2002 Final Warning

    From April 2002, the month following the first written warning, through November 2002, when OBI issued the second and final written warning, plaintiff was involved in six more incidents at work.  The first of these incidents took place on April 18, 2002, when a client, Regina Farage, came to the office to complain to Lawrence that plaintiff had failed to adequately prepare her for a deposition and had acted inappropriately both

in advance of and during the course of the deposition. Lawrence Aff. ¶ 78; Def.'s Ex. 49 (memo from Lawrence to Lecky, dated April 22, 2002). She stated that she felt that plaintiff was questioning her credibility and seemed more supportive of her adversary's position. Id. Following the receipt of the complaint, Lawrence notified Lecky who suggested that Lawrence meet with plaintiff. Id. During that meeting plaintiff denied any wrongdoing and although Lawrence took no action against plaintiff in connection with this complaint, he reassigned the case from plaintiff to himself. Id. ¶ 78.

Over the next several months co-workers reported a number of incidents to Lawrence about plaintiff's office conduct. The complaints included accounts of her muttering insulting remarks, initiating verbal shouting matches, publicly critiquing individual's work ethics, staring at others and asking inappropriate personal questions. Id. ¶¶ 79, 83, 85, 87; Def.'s Exs. 52, 54, 56 (various email correspondence between Lawrence and co-workers). After a representative from Human Resources met with all the co-workers who reported the aforementioned complaints, as well as with plaintiff, Lawrence recommended plaintiff's termination. Id. ¶ 89. Defendants instead issued plaintiff a "Final Written Warning on Behavior" ("Final Warning") dated November 6, 2002, addressing her pattern of disruptive conduct, which adversely affected the working environment for

other staff members.  Lawrence Aff. ¶ 90; Lecky Aff. ¶ 13; Def.'s
Ex. 58 (Final Written Warning on Behavior, dated November 6,
2002).

## (5)

## February 2003 Termination

Two final incidents in January 2003 ultimately led to
plaintiff's termination.  On January 17, 2003 Cheryl Kowalski, an
OBI claims adjuster in another office, e-mailed Lawrence a
description of an interaction with plaintiff in which she
characterized plaintiff as being very unfriendly and short with
her.  Lawrence Aff. ¶ 94.  When Lawrence brought the matter to
plaintiff's attention, she denied the accuracy of elements of
Kowalski's version of the conversation.  Lawrence Aff. ¶ 94. Two
weeks later, Christine Fontaine reported directly to Lecky that,
while walking down the hallway, she was approached by plaintiff,
who looked at Fontaine and stuck her tongue out at her.  Lecky
Aff. ¶ 17; Def.'s Ex. 86 (email from Christine Fontaine to
Lawrence, dated January 30, 2003).  Plaintiff denied having any
interaction with Fontaine that day, other than passing her in a
hallway late in the day.  Lawrence Aff. ¶ 96.

Following these two most recent incidents, Lawrence again
recommended plaintiff's termination.  Lawrence Aff. ¶ 97.  This
time, following consultation among Lawrence, Lecky, Andrea Babst
(Regional Vice President Human Resources), and Queenan (Human

Resources consultant), the panel decided to discharge plaintiff.

Id. Accordingly, on February 19, 2003, plaintiff's employment

was terminated. Id. ¶ 99; Def.'s Ex. 62 (Termination of

Employment, dated February 19, 2003).


**Discussion**

Summary judgment is appropriate when there is "no genuine

issue as to any material fact and...the moving party is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary

judgment is inappropriate where (1) the evidence presents a

factual dispute that a reasonable jury could decide in favor of

the nonmoving party, and (2) the fact in dispute will have a

material affect on the outcome of the case. See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All inferences

must be drawn from the underlying facts in a "light most

favorable to the party opposing the motion." United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962). Nevertheless, the party

opposing summary judgment must put forth "specific facts showing

that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In cases such as the one at bar, bare allegations of

discrimination "devoid of specifics, but replete with

conclusions" are not enough. Bickerstaff v. Vassar Coll., 196

F.3d 435, 451 (2d Cir. 1999). See also Meiri v. Dacon, 759 F.2d

989, 998 (2d Cir. 1985).

## Sex Discrimination

Plaintiff's employment discrimination claims are governed by the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny. In order to successfully bring a claim under Title VII, a plaintiff must first establish a <u>prima facie</u> case of discrimination. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993). If the plaintiff can meet this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision in question. <u>Id.</u> at 506-07. If the defendant is able to do so, the presumption of discrimination "completely drops out." <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000). The court must then examine the complete record to determine if the plaintiff can satisfy her ultimate burden of proving that the adverse employment action was discriminatory and that the reason proffered by the defendant is pretextual. <u>See</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

In order to carry the initial burden of establishing a <u>prima facie</u> case of discrimination, plaintiff must show that (1) she belongs to a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action and (4) the action occurred under circumstances giving rise to an

inference of discrimination.  <u>See</u> <u>McLee v. Chrysler Corp.</u>, 109

F.3d 130, 134 (2d Cir. 1997).  Defendants do not dispute the

first three prongs of the legal standard.  However, they do claim

there is no basis for finding that her discharge occurred under

circumstances giving rise to an inference of gender

discrimination.

With respect to this fourth prong, plaintiff must offer

evidence to suggest that her employer "treated [her] less

favorably than a similarly situated employee outside [her]

protected group."  <u>See</u> <u>Graham v. Long Island Rail Road</u>, 230 F.3d

34, 39 (2d Cir. 2000).  Only one of the plaintiff's claims of

disparate treatment involves an allegation that she was treated

differently from a male co-worker.[6]  Plaintiff claims that as a

result of the March 18, 2002 incident with Leonard Lewis, the

mailroom clerk, defendant issued her a formal written warning

letter for the documented episode but decided not to reprimand

her male co-worker.  Plaintiff Aff.  ¶ 45.  Plaintiff alleges

that the underlying reason for this disparity in treatment is

gender-based.  <u>Id.</u> ¶¶ 43-48; Plaintiff's Memo at 14.  However,

plaintiff has put forth no facts to show that Lawrence's decision

to issue her a warning was based on anything other than

---

[6]  In addition to Lewis, plaintiff claims that she was
treated differently than two other co-workers, Tyiesha Gainey and
Christine Fontaine, both of whom are females (and, therefore,
from the same protected group). Thus, gender could not have been
a factor in those particular instances.

plaintiff's previous record.  The record shows that Lawrence, in

fact, had a plethora of reasons to believe Lewis' account.

First, although plaintiff and Lewis traded charges about one

another's conduct, Lewis' record was otherwise unblemished, while

plaintiff's record was the subject of repeated concern.  Lawrence

Aff. ¶ 75.  Second, Lewis, not plaintiff, reported plaintiff's

outburst before plaintiff claimed provocation by Lewis.  Id.

Third, a witness observed Lewis to have been "shaken" by the

incident, an observation which belied his responsibility for

plaintiff's outburst.  Id.  Finally, and most notably, other than

plaintiff (who complained about many co-workers and was the

subject of many complaints), no one else ever complained of

inappropriate behavior by Lewis.  Id.  Consequently, plaintiff

fails the fourth prong because her bald allegation of

discrimination is insufficient to defeat summary judgment.

Although plaintiff fails to present a prima facie case of

discrimination, the legitimacy of defendant's reasons for

terminating plaintiff will, nonetheless, be examined.

Plaintiff's conduct had been the subject of prior written

warnings, including the Final Warning, and was increasingly

disruptive to the office environment.  Id. ¶¶ 74, 90.  Many of

the complaints were investigated and, although plaintiff

consistently denied any inappropriate conduct, there were, on

occasion, witnesses to these incidents.  Id. ¶ 70.  Based upon

her pattern of conduct reported by both co-workers in plaintiff's

department and outsiders, coupled with the fact that her behavior did not change even after formal warnings, plaintiff's employment was terminated.

Plaintiff, in an attempt to satisfy her ultimate burden, argues that the extensive record of her behavior was only a pretext for gender discrimination because: (1) the complaints were "sparse"; (2) the complaints were "false"; (3) no "prompt remedial action was taken to stop sexual harassment" allegedly directed at plaintiff; and (4) the defendants allegedly failed to follow standard disciplinary and investigatory procedures. Plaintiff's Memo at 2-3. However, viewed in light of the lengthy record documenting the numerous confrontations between plaintiff and co-workers (as well as an outside vendor and client), these four assertions are not sufficient to demonstrate that her discharge was motivated by her gender. First, although plaintiff views the complaints as "sparse," this is unsupported by the record because she was observed over twenty times during a three year span engaging in behaviors which seemed unusual and erratic, and which ultimately became disruptive to the workplace. Many of these complaints were reported by email to HR and/or Lawrence or otherwise documented.

Second, plaintiff's claim that the complaints against her were false is irrelevant to examining whether defendant's reasons for dismissing her were pretextual. A plaintiff's mere denial of responsibility for the incidents giving rise to termination,

without more, is insufficient to defeat summary judgment.
_Arqugliaro v. Brooks Brothers, Inc._, 927 F. Supp. 741, 745-47
(S.D.N.Y. 1996). Plaintiff also asserts that the myriad
statements, reports and complaints of co-workers and others are
"inadmissible hearsay" which may not be used to support summary
judgment. _Id._ at 1-2. However, receipt of complaints by co-
workers are admissible to establish that the employer had reason
to believe that a problem existed and to establish that it relied
on such complaints in taking the challenged action. _See_ _Roman v._
_Cornell University_, 53 F. Supp. 2d 223, 241 (N.D.N.Y.
1999)(finding that defendants may rely on co-worker complaints
"to support their conclusion that plaintiff often acted in an
inappropriate, insubordinate and unprofessional manner").

Third, defendants' supposed failure to remedy the alleged
sexual harassment provides no basis for establishing pretext.
Whether defendants could have changed the situation is
questionable because plaintiff was, and remains, vague about what
exactly the offensive facial expressions were and how they were
at all motivated by sexual animus. Although plaintiff has
mentioned that certain co-workers stuck their tongues out at her,
this behavior is more childish than harassing. Because Title VII
does not obligate defendant to remedy an environment that is
merely unprofessional, defendants were under no obligation to
address these complaints, even assuming they occurred as
plaintiff alleges. _See_ _Faragher v. City of Boca Raton_, 524 U.S.

775, 788 (1998)(stating that Title VII is not a "general civility code").

Finally, the fact that defendants failed to follow standard disciplinary procedures in ultimately discharging plaintiff does not support a claim of gender discrimination. See, e.g., Roman, 53 F. Supp. 2d at 241 (finding that an alleged failure to follow disciplinary procedures does not support discrimination claim). Although departures from procedural regularity can, in certain circumstances, form the basis of an inference of discrimination, see Stern v. Trustees of Columbia Univ. in the City of New York, 131 F.3d 305, 313 (2d Cir. 1997), here, the record is clear that defendants did in fact attempt on many occasions to address the situation. On several occasions both Lawrence and/or representatives from Human Resources met with plaintiff immediately after an incident was reported, but those meetings were unproductive because plaintiff gave vague responses and was reluctant to discuss the issues. In addition, defendants issued two formal written warnings, the second of which explicitly offered plaintiff an opportunity to acquire coaching and assistance.

Moreover, even if defendants did not follow standard procedure, plaintiff fails to indicate how defendants' actions were gender-based. Virtually all of the reports regarding plaintiff's behavior were provided by female co-workers and a female claims adjuster. Female Human Resource representatives

sought to counsel plaintiff regarding her workplace difficulties. The decision to issue the initial written warning was coordinated with Ann Lecky, a female HR representative, and the decisions to issue a Final Warning and ultimately to discharge plaintiff were coordinated by Lecky and subject to consultation with a female Regional Vice President of Human Resources.  A well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class.  <u>Marlow v. Office of Court Admin. Of New York</u>, 820 F. Supp. 753, 757 (S.D.N.Y. 1993), <u>aff'd</u>, 22 F.3d 1091 (2d Cir.), <u>cert. denied</u>, 513 U.S. 897 (1994).  Although this does not end the inquiry, it provides an additional inference which plaintiff must overcome.  <u>Toliver v. Community Action</u>, 613 F. Supp. 1070, 1074 (S.D.N.Y 1985)(stating that if decision maker is in same protected class as plaintiff, claims of discrimination become less plausible), <u>aff'd</u>, 800 F.2d 1128 (2d Cir.) <u>cert. denied</u>, 479 U.S. 863 (1986). Plaintiff can not overcome this inference, and therefore has not succeeded in establishing pretext.

## (2)

### Retaliation

In order to make out a <u>prima facie</u> case of retaliation, a plaintiff must show (1) she was engaged in a protected activity, (2) she suffered an adverse employment action, and (3) an

inference of a causal connection between the protected activity and the adverse action. <u>Van Zant v. KLM Royal Dutch</u>, 80 F.3d 708, 713 (2d Cir. 1996). Plaintiff's retaliation claim fails to satisfy both the first and third prongs of the <u>prima</u> <u>facie</u> case.

Plaintiff cannot meet the first prong because she cannot show that her complaints against co-workers and complaints regarding unequal pay were protected activities. Two activities are protected from retaliation under Title VII: (1) opposing an act of discrimination made unlawful by Title VII and (2) participating in an investigation under Title VII. <u>See</u> <u>Sumner v. U.S. Postal Service</u>, 899 F.2d 203, 208 (2d Cir. 1990). First, plaintiff's general complaints over alleged co-worker behavior (losing expense reports, stealing money, pranks, and work ethic) cannot form the basis of a retaliation claim under applicable law. <u>See</u> <u>Montanile v. National Broadcast Co.</u>, 211 F. Supp. 2d 481, 488 (S.D.N.Y. 2002)("Complaints regarding violation of employer policies unrelated to impermissible discrimination do not fall within the scope of Title VII, and, therefore, do not qualify for protection under the statute"); <u>Querry v. Messar</u>, 14 F. Supp. 2d 437, 451 (S.D.N.Y. 1998) (holding that allegations which did not clearly articulate a violation of civil rights laws, did not constitute a "protected activity"). Second, her alleged periodic complaints that she was being unfairly paid less than her counterpart Senior Trial Attorney did not rise to the level of protected activity since those complaint were not

articulated as gender-based discrimination but only as "unfair."
Such a generalized complaint did not reasonably put defendants on
notice of a statutory claim.[7]  See Duviella v. Counseling Serv.
Of the Eastern District of New York, No. 00-CV-2424, 2001 U.S.
Dist. LEXIS 22538 at 40 (E.D.N.Y. Nov. 20, 2001)(holding that
unfair treatment is not actionable under the civil rights laws
and a complaint about it does not constitute protected activity);
Ramos v. City of New York, No. 96-CV-3787, 1997 U.S. Dist. LEXIS
10538 at *7 (S.D.N.Y. July 22, 1997)(same).

Plaintiff's single mention to Lawrence in March 2002 that
Lewis' facial expressions were "sexual harassment" was likely a
protected activity, but there is no evidence causally connecting
that complaint with her termination in February 2003.
Accordingly, plaintiff fails to satisfy the third prong.

Plaintiff argues that her complaint to Lawrence of sexual
harassment led directly to her termination.  The only evidence
she presents to show causation is the fact that she was
terminated eleven months later. However, the "cases that accept
mere temporal proximity between an employer's knowledge of
protected activity and an adverse employment action as sufficient

---

[7]  In fact, plaintiff's claims seem to suggest precisely the
opposite. For instance, on another occasion, plaintiff complained
about the promotion of Joy Campanelli- another female- believing
it to be unfair or preferential in light of her view that
Campanelli was unqualified.  Plaintiff Aff. ¶ 23.  Obviously, a
claim that defendants were somehow treating another female too
favorably belies the notion that plaintiff was framing her
complaint around the issue of gender discrimination.

evidence of causality to establish a prima facie case uniformly

hold that the temporal proximity must be 'very close.'" <u>Clark

County School Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)(citation

omitted).  The eleven-month time lapse between plaintiff's latest

complaint[8] and her termination certainly exceeds that

requirement.  <u>See</u> <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174 (7th

Cir. 1992)(four-month gap between filing a grievance and issuance

of disciplinary letter could not, standing alone, raise inference

of retaliation).  Under the circumstances, plaintiff does not

raise a genuine issue of fact that retaliation played any role in

her dismissal.[9]

Nonetheless, even assuming plaintiff has established a <u>prima

facie</u> case of retaliation, the same burden-shifting analysis used

in claims of discrimination, discussed <u>supra</u>, also applies to

---

[8]  In an attempt to create "temporal proximity," plaintiff
for the first time in her brief alleges that she complained to
Lecky in October 2002 that Lewis was "still doing it" (his
alleged sexual harassment by facial expressions).  Plaintiff's
Memo at 13.  However, such a complaint cannot be asserted in a
brief for the first time in opposition to this motion.  <u>See</u>,
<u>e.g.</u>, <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir.
2001)(holding that factual allegations that might otherwise
defeat a motion for summary judgment will not be permitted when
they are made for the first time in the plaintiff's affidavit
opposing summary judgment and that affidavit contradicts the
plaintiff's own prior deposition testimony).

[9]  Although plaintiff's first formal warning may have
occurred almost immediately after her complaint of sexual
harassment, plaintiff does not argue that defendant issued this
warning in retaliation for her activity.  However, even assuming
that this proximity establishes a causal connection between
plaintiff's claim and the warning, plaintiff still cannot make
out a case for retaliation, as discussed <u>infra</u>.

retaliation claims brought pursuant to Title VII. See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003). Accordingly, the burden now shifts to the defendants to articulate a legitimate non-discriminatory reason for terminating plaintiff's employment. Plaintiff claims that defendants retaliated against her only after she notified Lawrence that Lewis had sexually harassed her in March 2002. However, as discussed supra, defendants have articulated a legitimate business reason for their decision to issue a formal written warning, a Final Warning and, ultimately, terminate plaintiff's employment. Plaintiff's pattern of behavior over the course of the years and the numerous documented complaints and expressions of concern which had been received from numerous sources, were the basis for the decision was made to terminate plaintiff's employment. Although the first written warning did in fact come immediately after plaintiff's episode with Lewis, by that time, plaintiff had already been involved in over fifteen other documented episodes with other employees and an outside vendor. Plaintiff has not provided sufficient evidence to show that defendants' action was taken in retaliation for her March 2002 complaint. Therefore, even if plaintiff had made out a prima facie case, her claim would fail because defendants have provided a legitimate, non-discriminatory reason for firing her, namely, that her conduct was increasingly disruptive to the office environment.

## Hostile Work Environment

When bringing a cause of action alleging a hostile working environment, a plaintiff must show "conduct (1) that is 'objectively' severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive [the 'objective' requirement], (2) that plaintiff 'subjectively perceive[s]' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex . . . [the 'prohibited causal factor' requirement]."[10] Gregory v. Daly, 243 F.3d 687, 691-692 (2d Cir. 2001)(brackets in original).

Defendants argue that plaintiff has not established any genuine issue of law as to any material fact for the first "objective" prong of this legal standard because the alleged facial expressions, upon which plaintiff's hostile environment claim appears to rest, were not severe or pervasive.  An

---

[10]  Plaintiff has made claims of hostile work environment under both Title VII and New York State Law. The Second Circuit has applied the same legal standard for proof of a hostile working environment claim under the New York Human Rights Law as required under Title VII.  Van Zant, 80 F.3d 708, 715 (2d Cir. 1996); Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995), abrogated on other grounds by Burlington Indus. Inc., v. Ellerth, 524 U.S. 742 (1998).

environment is hostile under Title VII when a workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993).  The Second Circuit has articulated a nonexclusive list of factors that are to be considered when judging if a working environment is objectively hostile, including, "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating or a 'mere offensive utterance;' (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted."  <u>Richardson v. New York State Dept. of Correctional Service</u>, 180 F.3d 426, 437 (2d Cir. 1999)(<u>quoting</u> <u>Harris</u>, 510 U.S. at 23).

Defendants contend that because plaintiff repeatedly refused to provide any specifics in support of her conclusory claims and because of her inability to describe in any detail the offensive facial expressions of co-workers (or Lawrence) during her employment at OBI or during discovery, the alleged conduct was neither pervasive nor severe enough to establish an objectively hostile working environment.  Plaintiff claims that she did, in fact, provide specifics to Lawrence and described the alleged facial expressions of Lewis.  However, on the record provided, plaintiff gives only a vague description of these acts, except for saying that her co-workers stuck out their tongues.

Plaintiff's Memo at 7. As stated earlier, sticking out one's tongue is a childish act, but is certainly not so severe that a reasonable person would find it harassing. In addition, plaintiff's claims that her co-workers made offensive facial expressions exemplifies at most an immature and unprofessional environment, not a hostile or abusive one.

As for the third prong, the 'prohibited causal factor,' the defendants argue that plaintiff did not create a genuine issue of material fact because she has not demonstrated that her co-workers' (or Lawrence's) conduct was based on sex. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'dicriminat[ion]...because of...sex.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). A plaintiff must show that the conduct of her employer was motivated by gender. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Plaintiff's hostile environment claim rests on an alleged pattern of co-worker offensive behavior primarily based on inappropriate facial expression and reporting of false complaints – conduct allegedly engaged in by Lawrence and Lewis (both male), as well as Fontaine, Phillips, Gainey and others (all female). Even if the alleged behavior occurred,[11] plaintiff has not provided any basis for concluding that the behavior was sex-based.

---

[11] All of plaintiff's aforementioned colleagues have denied ever making such faces.

## Violation of the Equal Pay Act

In order to prove a violation of the EPA, a plaintiff must first establish a <u>prima</u> <u>facie</u> case of wage discrimination by demonstrating that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 195 (1974); <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 524 (2d Cir. 1992). Although a plaintiff need not show her job is identical to a higher paid position to establish the second element, a plaintiff must demonstrate that her job is "substantially equal" in skill, effort, and responsibility. <u>Lavin-McEleney v. Marist College</u>, 239 F.3d 476, 480 (2d Cir. 2001). The standard for determining whether jobs are equal in terms of skill, effort and responsibility is "high." <u>Aldrich</u>, 963 F.2d at 524. In light of this, jobs which are "merely comparable" are insufficient to satisfy a plaintiff's prima facie burden. <u>Tomka</u>, 66 F.3d at 1310 (2d Cir. 1995); <u>Heap v. County of Schenectady</u>, 214 F.Supp.2d 263, 271 (N.D.N.Y. 2002).

Once a plaintiff establishes a <u>prima</u> <u>facie</u> case under the EPA, the burden shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses

provided under the Act; among them, a differential based on any
factor "other than sex." 29 U.S.C. 206(d)(1); <u>Corning Glass
Works</u>, 417 U.S. at 196; <u>Aldrich</u>, 963 F.2d at 524. Following such
proof by the employer, the plaintiff may counter the employer's
affirmative defense by producing evidence that the reasons the
defendant seeks to advance are actually a pretext for sex
discrimination. <u>Id.</u>

**a. Claim Relating to R. Alexander Hulten**

Plaintiff claims that defendants paid her less money than R.
Alexander Hulten ("Hulten"), a male attorney in the Brooklyn
Legal Office, even though both performed equal work, requiring
equal skill, effort, and responsibility. However, plaintiff
fails to make out a <u>prima</u> <u>facie</u> case on her equal pay claims with
regard to Hulten, because as a Trial Specialist, Hulten had
additional duties not assigned to plaintiff. These duties
included bearing responsibility for higher exposure and more
complex cases and virtually all of the office's federal court
lawsuits, as well as mentoring less-experienced attorneys. As
such, it cannot be said that the positions of Trial Specialist
and Senior Trial Attorney were "substantially similar" -
regardless of whether or not plaintiff performed many of the
functions for which the Trial Specialist was responsible. <u>See</u>,
<u>e.g.</u>, <u>Doria v. Cramer Rosenthal McGlynn, Inc.</u>, 942 F.Supp. 937,
942 (S.D.N.Y. 1996)("When the additional tasks of one job in

comparison to another job are substantial, the jobs are not congruent and the work is not equal."); <u>Dinolfo v. Rochester Telephone Corp.</u>, 972 F.Supp. 718, 723 (W.D.N.Y. 1997)(holding that there is no substantial equality between jobs where plaintiff claimed that some of her duties were similar to those of higher paid male employees but did not deny that some of her duties were not shared by them).  Plaintiff's equal pay claim with regard to Hulten must, therefore, be dismissed.

**b. Claim Relating to Corwin Del Toro**

Defendants acknowledge that plaintiff performed equal work to the other male Senior Trial Attorney, Corwin Del Toro, and that Del Toro was paid more than plaintiff. Accordingly, defendants may escape liability only by showing that the salary discrepancy was justified by factors "other than sex."  <u>See</u> <u>Belfi v. Prendergast</u>, 191 F.3d 129, 136 (2d Cir. 1999). Defendants maintain that the facts that Del Toro was a more experienced attorney and negotiated a higher salary resulted in the wage differential.

The Second Circuit recognizes that a pay differential based on differences in experience constitutes a legitimate business reason "other than sex" sufficient to sustain summary judgment for the employer under the EPA.  <u>See</u> <u>Holt v. KMI-Continental, Inc.</u>, 95 F.3d 123 (2d. Cir 1995).  Here, the respective levels of experience of plaintiff and Del Toro supports defendants' claim.

Del Toro is a 1981 graduate of George Washington University Law School and was admitted to the bar in 1982.  He was hired by the Brooklyn Legal Office as a Senior Trial Attorney in 1995.  Prior to being hired by the Brooklyn Legal Office, Del Toro worked for approximately ten years as an attorney, during which time he acquired trial experience, including eleven verdicts in accident cases.  By contrast, plaintiff graduated from law school in 1990 and was admitted to the bar in 1991 (nine years later than Del Toro.)  When she was hired by the Brooklyn Legal Office she had less than three and a half years experience and was hired in the lower-grade position of Trial Attorney.  When she was promoted to Senior Trial Attorney (a year and a half after being hired) she had a total of approximately five years legal experience. Lawrence Aff. ¶ 108.  Accordingly, defendant has established that Del Toro had far more experience than plaintiff and has, therefore, met its burden.

Defendants also allege that the higher salary was based on Del Toro's refusal to accept a job with the defendants at a lower salary, a factor which courts also recognize to be a legitimate business reason "other than sex" sufficient to sustain a summary judgment for the employer under the EPA. See Horner v. Mary Inst., 613 F.2d 706, 714 (8th Cir. 1980)(finding that the salary was based on a factor other than sex where a higher salary was paid to a male employee because his "experience and ability made him the best person available for the job and because a higher

salary was necessary to hire him"); <u>Sobol v. Kidder, Peabody &</u>
<u>Co., Inc.</u>, 49 F. Supp. 2d 208, 220 (S.D.N.Y. 1999)(holding that
an employer may pay higher wages to a male than a female when it
is necessary to do so in order to hire or retain an employee with
particular desired skills); <u>Sigmon v. Parker Chapin Flattau &</u>
<u>Klimpl</u>, 901 F. Supp. 667, 679 (S.D.N.Y. 1995)(paying male
associate more than female associate in order to keep him from
joining another firm was lawful); <u>Mazzella v. RCA Global</u>
<u>Communications, Inc.</u>, 642 F. Supp. 1531, 1552 (S.D.N.Y.
1986)(male employee's higher salary justified in part because he
could not be induced into transferring without a salary match).
When Del Toro applied for the position at the Brooklyn Legal
Office, he was earning $55,000 per year and was seeking a salary
of $70,000. Del Toro Aff. ¶ 4. Initially, Del Toro was offered
employment as a Senior Trial Attorney at a salary of $67,000 by a
letter dated March 23, 1993, but he rejected the employment offer
at that salary, having obtained a commitment from his then-
current employer, the New York City Transit Authority, to match
the salary being offered by the Brooklyn Legal Office. <u>Id.</u> ¶ 6.
Del Toro advised Robert Elan, then-Managing Attorney of the
Brooklyn Legal Office, that he would only accept employment with
the Brooklyn Legal Office at a salary of $73,000. <u>Id.</u> ¶ 7. As a
result of these negotiations, which took place eight months
before plaintiff even applied for a position with defendants, Del
Toro was offered the salary which he demanded and began working

31

as a Senior Trial Attorney. Defendants have, therefore, again, met their burden to show that the pay differential was due to a factor other than sex.

In an effort to show that defendants' reasons were pretextual and their decision was actually motivated by gender, plaintiff purports to challenge both defendants' reliance on "experience" and a "negotiated higher salary" as legitimate factors other than sex which justify the acknowledged pay disparity. With regard to experience, plaintiff seeks to substitute her view of relevant experience, namely, number of years of personal injury defense and number of jury verdicts, for the broader experience standards used by defendants, total years of practice and legal experience. This theory has no merit and is unsupported by any relevant case law. Defendants' view of experience, however, is well-supported by precedent. <u>See</u> <u>Holt</u>, 95 F.3d at 132; <u>Pantchenko v. C.B. Dolge Co., Inc.</u>, 581 F.2d 1052 (2d Cir. 1978). As to the negotiated salary, plaintiff does not dispute the fact that Del Toro was paid more because he negotiated a higher salary, but seeks to call that decision into question because, in her view, Del Toro was not worth the extra compensation. Again, this claim holds no merit. Whatever plaintiff's beliefs, they are irrelevant because she has failed to put forth evidence to suggest that defendants' explanations for the difference in compensation is due to anything other than

years of legal experience and a higher negotiated starting salary. Since she has not identified any evidence which would demonstrate that defendants' proffered reasons are pretextual,

defendants' motion for summary judgment on the pay discrimination claims with regard to Del Toro, is granted as well.[12]

**c. Sex-Based Wage Discrimination Claim Under Title VII**

Plaintiff also alleges discriminatory pay claims under Title VII and New York's Human Rights Law ("HRL").[13] The same standards generally apply to equal pay claims under the EPA and Title VII. However, claims pursuant to Title VII require a plaintiff to prove, in addition, that the pay differential was motivated by a discriminatory animus. <u>Tomka</u>, 66 F.3d at 1313. Since plaintiff cannot establish a <u>prima</u> <u>facie</u> pay discrimination claim under the EPA with regard to Hulten, her claim under Title VII with regard to Hulten must, as a matter of law, also be dismissed.

With regard to Del Toro, plaintiff has not presented sufficient evidence of intentional discrimination. Plaintiff attempts to argue that the fact that Lawrence never held team

___

[12] Plaintiff appears to have withdrawn her EPA claim arising from Marville and Balletti as comparators (<u>see</u> Plaintiff's Memo, <u>passim</u>.)

[13] Plaintiff's state-law HRL claim is governed by the same standards as her federal claim. <u>See</u> <u>Tomka</u>, 66 F.3d at 1304 n.4.

meetings, with or without plaintiff, is evidence of his intent to discriminate against her by preventing her from fully participating as a member of Lawrence's "all-male Team"[14] of Trial Attorneys. Plaintiff's Memo at 23. However, the fact that Lawrence never conducted Team Meetings does not constitute evidence of intentional discrimination because Lawrence didn't treat plaintiff any differently from her male co-workers.

Plaintiff also sets forth a set of jumbled facts relating to her salary increases at OBI in an attempt to show discriminatory intent. The record is clear, however, that the salary increases do not constitute a showing of discriminatory intent. During the period from 1995 to 2001, Lawrence recommended and the company implemented annual merit increases for all staff, including plaintiff and Del Toro. For years 1997, 2000 and 2001, Lawrence recommended, and the company implemented, slightly higher percentage increases for plaintiff than for Del Toro. Lawrence

---

[14] It is unclear, in any event, what plaintiff means by Lawrence's "all male Team" because as the managing attorney of the OBI Legal Department, Lawrence supervised seven male and six female attorneys. Plaintiff's Aff. ¶ 20. It appears that plaintiff's objection to the lack of team meetings stems from the fact that she saw Lawrence speaking to some of her male co-workers informally and eating lunch with them but did not do so with her. Plaintiff's Rule 56.1 Statement of Disputed and Undisputed Facts ¶ 110. Plaintiff repeatedly mentions in her papers that she chose not to socialize with her co-workers because she was intent upon her work and, therefore, chose not to eat in the lunchroom and disliked her co-worker's behavior. An inference of discrimination, therefore, certainly can not be taken from the fact that Lawrence may have chosen to respect her wishes.

Aff. ¶ 111.  For the year 2002, OBI annual compensation guidelines required that twenty-five percent of Brooklyn Legal Office staff be given no pay increase.  Id. ¶ 118; Lecky Aff. ¶ 29.  Lawrence selected both plaintiff and Del Toro to be among the twenty-five percent who were not given pay increases that year.[15]

Despite plaintiff's rambling claims, it is evident that once plaintiff and Del Toro were both Senior Trial Attorneys, their subsequent salary increases were in all respects comparable.  In all of those years, the defendants regularly established annual budgets for merit salary increases – guidelines which were applied to both plaintiff and Del Toro.  Since they both received annual merit increases keyed to their base salaries, a compensation system which was not based on sex, those increases were, as well, lawful.  See, e.g., Hein v. Oregon State College of Education, 718 F.2d 910, 920 (9th Cir. 1983)("[S]alary differentials that stem from unequal starting salaries do not violate the Equal Pay Act if the original salary inequity can be justified by one of the four exceptions to the Equal Pay Act"); Mazella, 642 F. Supp. At 1550.

**(5)**

---

[15]  Lawrence states that Del Toro was selected because his comparative performance did not warrant it and that plaintiff was selected because her pattern of disruptive behavior limited her overall contribution to the smooth running of the office. Lawrence Aff. ¶ 119.

## Breach of Implied Contract

In New York, when an employee is hired, absent an agreement setting forth a fixed duration of employment, an employment relationship is presumed to be a hiring "at will," terminable at any time by either party.  <u>Murphy v. American Home Products Corp.</u>, 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 235 (1983); <u>Baron v. Port Authority of New York & New Jersey</u>, 271 F.3d 81, 85 (2d Cir. 2001)(interpreting New York law).  The "at will" presumption is rebuttable only upon a showing that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment.  <u>Lobosco v. N.Y. Tel. Co.</u>, 96 N.Y.2d 312, 316, 727 N.Y.S.2d 383, 386 (2001); <u>Baron</u>, 271 F.3d at 85.  The New York Court of Appeals has admonished that this is an "explicit and difficult pleading standard," <u>Sabetay v. Sterling Drug, Inc.</u>, 69 N.Y.2d 329, 334, 514 N.Y.S.2d 209, 212 (1987).

Moreover, in <u>Baron</u>, the Second Circuit, interpreting New York Law, held that a clear disclaimer in an employee handbook precludes, as a matter of law, a claim for breach of contract, stating: "where a sufficiently unambiguous disclaimer, conspicuously placed in an employee handbook such that the employee reasonably could be expected to read it is at issue, the

totality of the circumstances inquiry is unnecessary; the implied contract claim must be dismissed as a matter of law." <u>Baron</u>, 271 F.3d at 88. Here, plaintiff alleges that during her employment there was no sufficiently conspicuous and unambiguous disclaimer stating that her employment was "at will."  She claims that OBI did not place its "at will" statement (Def.'s Ex. 87) or the "Disciplinary Action/Termination" policy (Def.'s Ex. 88), which states that One Beacon's policy for discipline in no way limits or alters the at will employment relationship, on the intranet until after her termination.  Defendants, on the other hand, claim that these sections of the employment policy did exist as part of the OBI Intranet Handbook during plaintiff's employment. Plaintiff also argues that the information outlined on the "Details for Management" section ("Details") is a part of the Employee Handbook ("Handbook") and constitutes a written policy limiting the employer's right of discharge creating an implicit contractual obligation on the part of defendants.

Regardless of whether the "at will" statement or "Disciplinary Action" appeared in the Handbook, plaintiff's implied contract claim fails because the procedures set forth in the Details are not sufficient to constitute an express limitation on OBI's right to terminate an individual's employment.  First, plaintiff completed an employment application at or about the time she was hired by General Accident Insurance

Company ("GA"), which became CGU Insurance Company ("CGU"), OBI's immediate predecessor.  The GA application provided in part: "I understand that no one except the Chief Executive Officer of General Accident has authority to enter into an agreement on the Company's behalf which would grant employment for a set period of time of employment or specify any special terms of employment. I further understand my employment is to be on an 'at will' basis." Def.'s Ex. 9 (plaintiff's signed GA application).  Plaintiff has presented no evidence that she was given any indication that her "at will" employment status changed when CGU succeeded GA or when OBI succeeded CGU.[16]

Although defendants contend that the Details are not part of the Handbook,[17] regardless, the statements contained therein

_____

[16]  In plaintiff's affidavit she points out that GA and OBI are separate companies and that when OBI succeeded CGU, changes were made with regards to staffing, benefits, stock programs and other compensation programs. However, she offers no specific evidence showing that OBI did not adopt GA's or CGU's employment policies.  See Plaintiff Aff. ¶ 17.  In fact, OBI's "Employment at Will" and "Disciplinary Action/Termination" policies, as presented by the defendants, were consistent with the policies of its predecessor, CGU. Lecky Aff. ¶ 25; Def.'s Ex. 90.

[17]  Defendants argue that the Details are intended to be accessed by management only and are therefore, not technically included in the Handbook.  Plaintiff claims that the "Details for Management" link is in fact part of the Employee Handbook because on each page of the "Details for Management" link are the words "Employee Handbook."  See Plaintiff Ex. 11.  However, it is not clear that the placement of those words are intended to categorize those particular pages as part of the Employee Handbook or if it is meant to serve as a "link" to return back to the Employee Handbook.

cannot constitute an express limitation on OBI's right to hire, fire, promote, demote, transfer or take any other employment action it deems otherwise appropriate. To the contrary, the Details simply offer suggestions on how to coach employees and "motivate an improvement in performance/behavior." <u>See</u> Plaintiff Ex. 11 at 2. The Details also set out coaching guidelines and establish a progressive disciplinary process which allows for flexibility in specific circumstances. <u>Id.</u>

In <u>Marfia v. T.C. Ziraat Bankasi</u>, 147 F.3d 83 (2d Cir. 1998), the Second Circuit concluded that an employment handbook which contained a rigid disciplinary policy that stated "that discipline be administered <u>only</u> <u>for</u> <u>just</u> <u>and</u> <u>good</u> <u>cause</u>" constituted an express written policy limiting the employer's right to dismiss employees at will. <u>Id.</u> at 88 (emphasis in original). In contrast, OBI's Handbook, absent of any such promises, explicitly offers management the opportunity to accelerate the administration of discipline in unique situations. <u>See</u> Lecky Aff. ¶ 24; Def.'s Ex. 89 at 4. Therefore, the Details cannot be construed to change the "at will" status of any OBI employee.

Nonetheless, even if the guidelines rose to the level of an implied contract, OBI's progressive discipline of plaintiff prior to her termination plainly met the requirements of those guidelines. Plaintiff claims that she was never coached prior to

her written warnings and that defendants did not act in good faith in accordance with the procedures. However, the record clearly shows that Lawrence and the Human Resources representatives made numerous efforts to follow the Handbook's suggested procedures. After each co-worker complaint, either Lawrence or a representative from Human Resources attempted to meet with plaintiff to discuss the situation. Plaintiff was reticent and uncooperative or denied that anything had happened at all. Moreover, in the Final Warning, dated November 6, 2002, Lawrence once again extended himself to plaintiff assuring her that "as always I am here to coach and assist you in any way possible." Def.'s Ex. 58. Therefore, although plaintiff may not have been satisfied with Lawrence's and others' attempts to counsel her, they, nonetheless, terminated the plaintiff for cause after following all the necessary steps. Plaintiff's implied contract claim must, therefore, be dismissed, as it lacks any merit.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted, and all of plaintiff's claims are dismissed with prejudice. The Clerk of Court is directed to close the case.


Dated:     Brooklyn, New York
           August 29, 2005


                         SO ORDERED:


                         _____/s/_____
                         David G. Trager
                         United States District Judge